In re Robert Lee WHITAKER and Phyllis Lucille Whitaker, Debtors.

Robert Lee WHITAKER, Plaintiff,

v.

W. B. LOCKERT, Jr., District Attorney General, and Claude L. Martin, d/b/a Claude Martin Realty, Defendants.

Bankruptcy No. 380–02309.
Adv. No. 381–0239.

United States Bankruptcy Court,
M. D. Tennessee.

Jan. 14, 1982.

John C. Zimmermann, Nashville, Tenn., Roy N. Wilson, Dickson, Tenn., for debtors.

Claude L. Martin, pro se.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

The issues before the court are whether this court should enjoin a creditor and district attorney general for the State of Tennessee from criminally prosecuting a debtor under Tennessee's bad check law and whether the creditor should be held in contempt for his actions with appropriate sanctions. After consideration of the transcript of the hearing of this matter on June 4, 1981, affidavits submitted at that hearing, stipulations, exhibits, briefs of the parties and the entire record, this court finds such action is both necessary and appropriate.

The following shall constitute findings of fact and conclusions of law pursuant to Rule 752 of the Federal Rules of Bankruptcy Procedure.

This adversary proceeding was commenced by the debtor, Robert Lee Whitaker, to permanently enjoin the defendants, Claude L. Martin, and W. B. Lockert, Jr., District Attorney General for the 21st Judicial Circuit of the State of Tennessee, from taking any action to further prosecute the debtor for the alleged violation of § 39–1959 *et seq.* of the Tennessee Code. The debtor also sought to hold the defendant Martin in contempt and to impose sanctions requiring the defendant to pay all the debtor's cost in regard to this matter, including reasonable attorney fees.

In the summer of 1979, the debtor was moving from Johnson City to Dickson County, Tennessee. On July 2, 1979, he executed a check payable to the defendant Martin in the amount of $5,000.00 as earnest money for a tract of real property in Dickson, Tennessee. When the check was executed, the debtor had approximately $200.00 in his account in the Hamilton Bank of Johnson City, Tennessee. According to the debtor, the defendant Martin knew that he did not have sufficient funds in the bank and that he planned to cover the check when he sold his garage in East Tennessee. The sale of the garage to the prospective buyer was not consummated and the check was not covered.

The defendant Martin received the check at the closing of the property on July 5, 1979, and thereafter deposited the check. It was returned four to six days after the closing with insufficient funds stamped on it. The defendant Martin testified that, four to five days after he received the check, the debtor called him and "told me that it was bad."

The debtor testified he called the defendant Martin to notify him he wanted to close out the account since he was leaving Johnson City, and the defendant Martin informed him that there was no problem and to come see him upon his return to Dickson. The defendant Martin did not dispute this testimony.

After the return of the check for insufficient funds, the defendant Martin helped the debtor move onto the property and paid for the transportation of the debtor's goods from Johnson City to Dickson County.

The defendant Martin testified that after the debtor told him the check was "bad," the debtor said he would be in next Monday with cash to cover it but "the next Monday is still going on." The defendant Martin did not give the debtor any written notice that the check was bad but talked to the debtor on many occasions in regards to the check. The defendant Martin further testified that after "hounding" the debtor for a year, the debtor executed a note in satisfaction of the check.

The debtor testified Martin told him if he didn't sign the note in satisfaction of the check, "he was going to have [him] locked up" and that, after threats, he signed the note. He further testified that, after signing the note, the defendant Martin said he had forgotten to bring the check in spite of the fact the debtor had signed the note to get the check back. The debtor then sought advice from his attorney and was told to forget about it because the note would substitute for the check. None of this testimony was contraverted by the defendant Martin.

Some time after the delivery of the check to the defendant Martin, the debtor made a

payment of approximately $150.00 to $175.00 which was accepted by Martin. A receipt was given to the debtor in recognition of this transaction. However, the receipt was not made an exhibit nor was the exact date of the payment established.

On August 1, 1980, approximately 13 months after delivery of the check to the defendant Martin, the debtor filed a voluntary petition in bankruptcy. The debtor's schedules listed Claude Martin as a secured creditor on the basis of the note which was entered into in satisfaction of the check.

The defendant Martin was represented by counsel during this period. He testified his attorney, now deceased, failed to act on his claim in bankruptcy and he had relied on the attorney to take care of the matter. Nevertheless, the defendant Martin appeared at the meeting of creditors on August 25, 1980, and raised no objections at that meeting.

On September 24, 1980, the time period for filing a complaint against the dischargeability of a debt expired without either the defendant Martin or any other creditor filing such a complaint. On October 7, 1980, the debtor was granted a discharge from all dischargeable debts, including his obligation to the defendant Martin.

Approximately sixteen months after receiving the check from the debtor and shortly after the debtor received his discharge from court, the defendant Martin initiated criminal proceedings under Tennessee's bad check statute.[1] The defendant Martin testified that he first discovered the check was bad after the discharge and "it made [him] pretty mad."

The defendant Martin frequently received bad checks in his business but would only initiate criminal prosecutions on those checks he could not collect. He described this process as "turn[ing] them into the Sessions Court for collection." The defendant Martin believed his inability to collect on these bad checks demonstrated that the drawers were trying to defraud him. This past experience does not support his testimony that he did not realize the debtor's check was originally returned for insufficient funds after the closing. Nor does this support his contention that he did not realize the possibility of criminal conduct on the debtor's part until sixteen months after the check was returned marked insufficient funds.

The Dickson County Grand Jury returned an indictment against the debtor for the offense of drawing a check without sufficient funds in the amount of $5,000.00, in violation of § 39–1959 of the Tennessee Code. The debtor's trial was scheduled to begin June 2, 1981. Prior to the assigned

---

1. Tenn.Code Ann. § 39–1959 provides:

"It shall be unlawful for any person with fraudulent intent to make or draw or issue or utter or deliver any check, draft or order for the payment of money drawn on any bank, corporation, firm or person for the purpose of obtaining money, services, or any article of value, or to obtain credit, knowing at the time of making, drawing, uttering or delivering said draft, check or order that the maker, or drawer, has not sufficient funds in, or on deposit with, such bank, corporation, firm or person, for the payment of such check, or draft, or order in full, and all other checks, drafts or orders upon such funds then outstanding."

Tenn.Code Ann. § 39–1966 defines the penalties for violation of Tenn.Code Ann. § 39–1959 as follows:

".... Any person violating §§ 39–1959—39–1965 upon conviction shall be punished as follows:

(a) When the amount for which the check, draft, or order is drawn is for an amount not exceeding one hundred dollars ($100), it shall be punishable upon conviction as a misdemeanor by confinement in the county jail or workhouse for not more than eleven (11) months and twenty-nine days (29) or fine not exceeding five hundred dollars ($500), or both in the discretion of the court or jury.

(b) When the amount for which the check, draft, or order is drawn or where the combined amount of more than one check, draft, or order, or any combination thereof, is for more than one hundred dollars ($100), it shall be punishable by confinement in the penitentiary for not less than three (3) years nor more than ten (10) years.

(c) In addition to either of the punishments prescribed in paragraph (a) or paragraph (b), as appropriate, the court shall require the convicted person to pay to the holder of the check, draft or order the amount due thereon."

trial date, Assistant District Attorney General J. Kenneth Atkins approached the debtor's attorney and offered "to nolle the criminal case upon restitution and cost." Defendant Martin testified he was not quite sure if he told General Atkins that he "would be willing to drop the whole thing if [he] got his money back."

On May 20, 1981, on the application of the debtor, this court issued a preliminary injunction enjoining the defendants from pursuing any criminal prosecution of the debtor for the alleged violation of § 39–1959 *et seq.* of the Tennessee Code. A final hearing was held on June 4, 1981, for presentation of proof on all issues now before the court.

As to jurisdiction, it is obvious that this court possesses jurisdiction to consider the debtor's petition under the authority of § 105(a) of the Bankruptcy Code which, provides:

"(a) The Bankruptcy Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

During the transition period,[2] this jurisdictional grant is limited by the provisions of § 1481 of Title 28 of the United States Code which states:

"A bankruptcy court shall have the powers of a court of equity, law, and admiralty, but may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment."

28 U.S.C. § 1481.[3]

The fundamental purpose of bankruptcy law, both under the previous Bankruptcy Act and the current Bankruptcy Code, is to ensure a "fresh start" to the debtor, who is entitled to the full relief given by the bankruptcy law. In the often cited passage from *Local Loan Company v. Hunt,* 292

U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), the United States Supreme Court stressed the importance of the fresh start provisions of the Bankruptcy Act:

"One of the primary purposes of the Bankruptcy Act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh from the obligations and responsibilities consequent upon business misfortunes.' This purpose of the Act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." (citations omitted).

292 U.S. at 244, 54 S.Ct. at 699.

In the enactment of the Bankruptcy Code, Congress re-emphasized the primary importance of assuring the debtor a fresh start. In creating a federal exemption scheme, the pertinent House Report emphasized that "there is a Federal interest in seeing that a debtor [who] goes through bankruptcy comes out with adequate possessions to begin his fresh start." H.R.Rep. No.95–595, 95th Cong., 1st Sess. 126, *reprinted in* [1978] U.S.Code Cong. and Ad. News 5963, 6087. This federal interest in insuring that the debtor receive a fresh start is further evinced by the broadened effect of the discharge under § 524(a) of the Bankruptcy Code. *See* 3 Collier, Bankruptcy § 524.01 (15th ed. 1981). Section 524(a)(2) provides:

"(a) A discharge in a case under this title—

\*     \*     \*     \*     \*     \*

(2) operates as an injunction against the commencement or continuation of an

---

**2.** The transition period extends from October 1, 1979, through March 31, 1984.

**3.** The petitioning plaintiff in this case does not request a stay of the state court itself, but rather of the named respondents from prose-

cuting the proceedings in the state court. The ultimate effect, of course, is the same. *See generally Barth v. Broshot,* 4 B.R. 141, 143–144 (Bankr.Ct.W.D.Mo., W.D.1980).

action, the employment of process, or any act, to collect, recover or offset any such debt as a personal liability of the debtor, or from property of the debtor, whether or not discharge of such debt is waived;" 11 U.S.C. § 524(a).

Section 524(a)(2) clearly states that the discharge operates as an injunction against the continuation of an action to collect, recover or offset any debt from property of the debtor. The legislative history of § 524(a) indicates:

> "The change is consonant with the new policy forbidding binding reaffirmation agreements under proposed 11 U.S.C. 524(d), and is intended to insure that once a debt is discharged, the debtor will not be pressured *in any way* to repay it. *In effect, the discharge extinguishes the debt, and creditors may not attempt to avoid that.* (emphasis added).

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 366, *reprinted in* [1978] U.S.Code Cong. and Ad.News 5963, 6321–6322; Sen.Rep.No.95–598, 95th Cong., 1st Sess. 80 *reprinted in* [1978] U.S.Code Cong. and Ad.News 5787, 5866.

The purpose of § 524(a) is to accord the debtor *complete relief. See Layfield v. Director of Public Safety*, 12 B.R. 846, 7 Bankr.Ct.Dec. 1201, 1202 (Bankr.Ct.N.D. Ala., S.D.1981); *University of Alabama Hospitals v. Warren*, 7 B.R. 201, 7 Bankr.Ct. Dec. 75, 76–78 (Bankr.Ct.N.D.Ala.1980). Thus, by its language, § 524(a)(2) prohibits the creditor Martin from receiving any payment of the discharged debt as a result of the criminal proceedings currently pending against the debtor.[4] Nor can the State of Tennessee utilize its criminal process to force a debtor to pay a discharged debt to a creditor, either through a negotiated plea bargain or as an order of restitution im-

posed after conviction in accordance with § 39–1966(c) of the Tennessee Code. In such a case, the State would be indirectly enforcing a debt which could not be enforced directly by the creditor in either a state or federal court. *Bray v. Holley*, 12 B.R. 359, 363 (Bankr.Ct.M.D.Ala.1981); *Manier v. Tennessee*, Bk. 78–31528 (Bankr. Ct.M.D.Tenn.1980).

A more difficult question is whether the District Attorney General should be enjoined from pursuing the criminal prosecution of the debtor under Tennessee's bad check statute.[5] Strong policy considerations inveigh against federal interference with pending state court criminal prosecutions. In *Kluger v. Helfant*, 421 U.S. 117, 123, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975), *rehearing denied* 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686, the United States Supreme Court explained this "federal abstention doctrine" as follows:

> "When a federal court is asked to interfere with a pending state prosecution, established doctrines of equity and comity are reinforced by the demands of federalism, which require that federal rights be protected in a manner that does not unduly interfere with the legitimate functioning of the judicial systems of the States."

A federal court may enjoin a state criminal prosecution only in cases of "proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown." *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1970).

No evidence has been presented in this case which would indicate that the district

---

**4.** The State of Tennessee contends that the debt in question is non-dischargeable. This issue has already been resolved in the debtor's earlier bankruptcy proceedings. The State cannot now complain that the debt was non-dischargeable. *Evans v. Godfrey*, 472 F.Supp. 364, 370 (M.D.Ala., N.D.1979).

**5.** An injunction against the creditor alone would not affect the continuation of this crimi-

nal proceeding. All criminal prosecutions are conducted in the name of the State of Tennessee. Tenn.Code Ann. § 40–303. The creditor, even though marked on the indictment as the "prosecutor" of this criminal proceeding, has no control over the ultimate disposition of the case. *State v. Loftis*, 40 Tenn. 500, 501 (1859); *Chambers v. State*, 22 Tenn. 237, 241–242 (1859).

attorney instituted the prosecution of the debtor in bad faith.[6] However, if the district attorney is allowed to continue this criminal prosecution, irreparable harm will result to the debtor. By virtue of § 524(a)(2), the creditor Martin is prohibited from receiving any payment from the debtor on the discharged debt. The debtor is thus precluded from effectuating a plea bargain whereby the district attorney would withdraw the criminal charge upon the payment of restitution and cost by the debtor. This type of settlement is often utilized in bad check prosecutions and, in fact, was offered to the debtor in the present case. These circumstances effectively place the debtor between the proverbial "rock and a hard place." Any payment by the debtor to the creditor Martin is contrary to the order of discharge which the debtor received from this court. Yet, if the debtor refuses to pay the discharged debt, he faces the cost and anguish of a criminal trial with the ultimate possibility of a prison sentence. The debtor's anomalous predicament necessitates the issuance of a permanent injunction against the district attorney.

The court is especially concerned about the ultimate goals of this criminal prosecution. It is a matter of common knowledge that creditors in Tennessee frequently resort to the threat of a criminal prosecution to compel the payment of a civil debt. In many, if not most instances, criminal prosecutions brought under the bad check and similar statutes are ultimately resolved by the criminal charges being withdrawn in return for the payment of restitution and costs by the defendant. This is so engrained in the criminal system of this state that the creditor Martin referred to his practice of dealing with bad checks as "turn[ing] them into the Sessions Court *for collection.*"

■ When a criminal statute is used primarily to recover a dischargeable debt, the bankruptcy court may enjoin the criminal prosecution.[7] *In re Kaping,* Bankr.L.Rpts. CCH ¶ 68,298 (Bankr.Ct.D.Or.1981). *See also In re Burke,* Bankr.L.Rpts. CCH ¶ 66,368 (E.D.Tenn.1976); *In re Penny,* 414 F.Supp. 1113 (W.D.N.C.1976); *In re Lake,* 11 B.R. 202 (Bankr.Ct.S.D.Ohio, E.D.1981); *Reid v. Young,* 9 B.R. 830 (Bankr.Ct.M.D. Ala.1981); *In re Caldwell,* 5 B.R. 830 (Bankr.Ct.W.D.Vir.1980); *In re James,* 10 B.R. 2 (Bankr.Ct.W.D.N.C.1980); *Childs v. Castleberry,* 3 Bankr.Ct.Dec. 389 (B.J.E.D. Ark.1977). The district attorney's offer "to nolle the criminal case upon restitution and cost" indicates that the motivation of this prosecution was not punishment but the recovery of a discharged debt. In such a case, the issuance of an injunction is required in order to effectuate the judgment of the bankruptcy court. *See Younger v. Harris,* 401 U.S. 37, 43, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1970). In enacting the discharge provisions of the Bankruptcy Code, Congress expressed its intention to provide complete relief for honest debtors. To allow the prosecution of the debtor herein would destroy the ability of this court to enforce this Congressional intent.

■ This court refuses to place this debtor in a position where he must consider reobligating or paying a debt discharged under the Bankruptcy Code during a criminal proceeding instituted by a creditor. In many instances, criminal defendants, when faced with the costs in legal fees of defending a felony prosecution and when considering the uncertainty of a jury verdict, will, regardless of innocence, find it attractive to accept the settlement offered by the district attorney, especially if the settlement involves only restitution.

---

6. The law is well-settled that any bad faith on the creditor's part in initiating this criminal prosecution cannot be imputed to the district attorney's office. *See Allee v. Madrano,* 416 U.S. 802, 836–838, 94 S.Ct. 2191, 2210–2211, 40 L.Ed.2d 566 (1974); *Lewis v. Kugler,* 446 F.2d 1343, 1348–1349 (1971); *Childs v. Castleberry,* 3 Bankr.Ct.Dec. at 390.

7. The indirect or direct use of a criminal statute to collect a discharged debt may also violate Article 1, Section 18, of the Tennessee Constitution, which prohibits imprisonment for civil debt. *See Tolbert v. State,* 321 So.2d 227, 232 (1975). *See also* Annot., 23 A.L.R. 459 (1923).

Therefore, an order will be entered permanently enjoining the District Attorney General from pursuing this criminal prosecution against the debtor.[8]

■ Finally, this court must determine whether to hold the defendant Martin in contempt for his initiation of criminal proceedings against the debtor after his debt was discharged by this court. The defendant Martin denies he is using the state criminal process to aid in the collection of the discharged debt. However, he took no criminal action against the debtor when he initially learned that the debtor's check had been dishonored due to insufficient funds. Instead, after hounding the debtor for a year, the defendant Martin had the debtor execute a note in satisfaction of the $5,000.00 check. And, although the defendant Martin was aware of and participated in the debtor's bankruptcy proceedings, he did not at any time object to the dischargeability of his debt. The defendant Martin did not institute this criminal action until the discharge of the debtor at the termination of the bankruptcy proceeding, sixteen months after the debtor's check was dishonored. Such a delay makes it obvious that the creditor Martin was attempting to use the state criminal process to coerce the debtor into repayment of the discharged debt. The provisions of § 524(a) prohibit this type of harassment. *See In re Wil-*liams,* 9 B.R. 228, 7 Bankr.Ct.Dec. 388, 391 (Bankr.Ct.D.Kan.1981).

The defendant Martin has failed to comply with this court's order of discharge. Civil contempt is "a sanction to enforce compliance with an order of the court *or to compensate for losses or damages sustained by reason of noncompliance.* McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 98 L.Ed. 599 (1948) (citations omitted) (emphasis added). Civil contempt is therefore an appropriate sanction for the creditor Martin's noncompliance with the court's order of discharge. *See, Matter of Batla,* 12 B.R. 397, 400–401 (Bankr.Ct.N.D. Ga.1981). *See also* Collier, Bankruptcy ¶ 524.01 (15th ed. 1981).

Accordingly, an order will be entered pursuant to Rule 920 of the Federal Rules of Bankruptcy Procedure requiring the creditor Martin to pay the cost of the debtor for defending the criminal action in Dickson County and for pursuing his action in this court, including reasonable attorney's fees.[9]

So this amount can be determined, the attorney for the debtor shall submit an affidavit as to the time expended by him or by any other attorney representing the debtor with a complete breakdown of the time expended and an affidavit from the debtor detailing his non-legal expenses from the two actions.

---

**8.** This conclusion does not imply that a debtor's discharge in bankruptcy will automatically enjoin the initiation or continuation of any criminal proceeding against the debtor. The provisions of § 524(a) defining the effect of discharge must be read in conjunction with the automatic stay provisions of § 362. Section 362(b) specifically provides:

"(b) The filing of a petition under Section 301, 302, or 303 of this title does not operate as a stay—

(1) Under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor; . . . .".

A criminal action against the debtor thus remains outside the scope of the debtor's bankruptcy proceedings. To obtain an injunction of criminal proceedings, the debtor must bring an affirmative petition before the bankruptcy court. 2 Collier Bankruptcy ¶ 362.05 (15th ed. 1981). This rationale should apply with equal force to the continuation or initiation of any criminal proceeding against the debtor *after* the debtor's discharge in bankruptcy. This conclusion is consistent with the strong federal policy against federal interference with pending state court proceedings. Only under extraordinary circumstances, such as those exemplified in the present case, should a federal court interfere with a pending state court prosecution.

**9.** Sanctions against a creditor who has committed contempt are not limited to the $250.00 fine ceiling of Bankruptcy Rule 920(a)(3), since that rule only governs punitive sanctions. The bankruptcy court may therefore impose sanctions including compensatory damages, cost, and attorney's fees. *Brooks v. Ford Motor Credit Co.,* 12 B.R. 283, 8 Bankr.Ct.Dec. 95 (Bankr.Ct.W.D.Mo.1981); *Preferred Surfacing, Inc. v. Swinett Bank and Trust Co.,* 3 Bankr.Ct. Dec. 94, 96 (B.J.N.D.Ga.1976).