**In re David Arthur SIMONINI.**

No. 3:02–CV–275.
Bankruptcy No. 02–30033.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 8, 2002.

Langdon M. Cooper, Gastonia, NC, Edward T. Hinson, James, McElroy & Diehl, Charlotte, NC, for petitioner.

Jim Pendergraph, Charlotte, NC, pro se.

Michael F. Easley, N.C. Dept. of Justice, Raleigh, NC, pro se.

Daniel Awstrum, Chief Deputy District Attorney, Clark County District Attorney's Office, Las Vegas, NV, pro se.

Mary Catherine Holcomb, Holcomb & Fletcher, Charlotte, NC, pro se.

## OPINION

GRAHAM C. MULLEN, Bankruptcy Judge.

THIS MATTER is before the Court upon the Motion of David Arthur Simonini ("Simonini" or "Debtor") for a an Injunction and Any Other Equitable Relief, and any other outstanding motions. A temporary injunction staying the Debtor's extradition was entered after oral argument on July 11th, 2002. Additional oral argument was heard on August 8th, 2002.

All outstanding motions are now ripe for disposition.

*Facts and Procedural Background*

Simonini filed in the Western District of North Carolina under Chapter 7 of the United States Bankruptcy Code on January 7th, 2002. On January 8th, 2002, a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines ("Notice") was served on the creditors and other parties in interest, including the Clark County District Attorney's Office—Bad Check Diversion Unit in Las Vegas, Nevada ("BCDU") and the Rio Suite Hotel and Casino ("Casino") (BCDU and Casino collectively "Nevada") in Las Vegas. Invoking 11 U.S.C. § 362 ("362"), the Notice advised creditors of the automatic stay and of an April 15th, 2002 deadline for filing a complaint against Simonini to determine the dischargeability of debt. Neither the BCDU nor the Casino ever filed a complaint with the bankruptcy court to determine dischargeability of debt; indeed they have not participated in the bankruptcy proceedings at all. Instead, having received the Notice, BCDU and the Casino persisted in their post-petition attempts to collect a pre-petition general unsecured debt without involving the bankruptcy court.

It is integral to the Court's analysis that neither the Casino nor the BCDU has sought relief from the automatic stay. Neither one filed a Complaint objecting to the dischargeability of the gambling debts before the April 15th expiration date.[1] Instead of seeking recourse in the federal bankruptcy system, the Casino and BCDU have relied on Nevada state law. Consequently, in furtherance of the effort to collect Simonini's debt to the Casino, the Casino, through the BCDU, charged Simonini with "Drawing and Passing a

---

1. The Trustee has obtained an extension of time for his objection to discharge under 727. Other individual creditors have sought extension under 523, but not Nevada—not the Casino or BCDU.

Check Without Sufficient Funds in the Drawee Bank with the Intent to Defraud, Presumption of Intent to Defraud." Simonini's principal allegation is that the state criminal prosecution constitutes willful, intentional, gross and flagrant violation of 362, and that the Casino and BCDU, by violating the automatic stay and Order of Relief, are in contempt of the Bankruptcy Court. Simonini alleges that the prosecution is an attempt to use the Nevada District Attorney and Nevada criminal law to collect a civil debt incurred before Simonini filed the bankruptcy petition, which could violate 362.

Since Simonini was in North Carolina, the Casino and BCDU obtained a Governor's Warrant, pursuant to which Simonini was held for extradition to Nevada until July 2nd, 2002, when this Court entered an Order granting his Motion for a Writ of Habeas Corpus and temporarily restraining Simonini's extradition. The Court, at that time, also granted Simonini's Motion for a Preliminary Injunction Hearing.

### Analysis

***I. Tension exists between the protection extended to debtors by the 362 automatic stay and the need to serve the public interest by bringing criminal prosecution; however, the federal government intended to exempt all criminal prosecutions from 362(b)'s automatic stay.***

■■■■ 11 U.S.C. § 362 ("362")[2] provides for an "automatic stay" of creditors'

attempts to collect pre-petition debt from debtors who file a bankruptcy petition.[3] It states in relevant part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . Operates as a stay, applicable to all entities, of—

(1) the commencement of or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

The automatic stay, which is effective immediately and automatically when the bankruptcy petition is filed, is extremely broad in scope for reasons made clear by Congress and the Fourth Circuit. In *Grady v. A.H. Robins Co., Inc.*, Judge Widener cited relevant legislative history, which interests the Court as an expression of policy:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repay-

---

**2.** References to 362, 105, 523, and subsections thereof refer to sections in Title 11 of the United States Code whenever referred to herein.

**3.** The Court notes as a preliminary matter that the sovereign immunity contention is meritless under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Private citizens can petition a federal court to enjoin state officials in their official capacities from engaging in ongoing conduct that violates the

Constitution or a federal statute. *See Antrican v. Odom*, 290 F.3d 178, 184–86 (4th Cir. 2002). "*Ex Parte Young* 'permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury.'" (citing *Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). For the reasons discussed *infra*, this rule applies here.

ment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. 839 F.2d 198, 200 (4th Cir.1988) (quoting House Report No. 95–595, 95th Cong. 1st Sess. 340–1 (1977); Senate Report No. 95–989, 95th Cong.2d Sess. 54–55 (1978); reprinted in 1978 U.S.Code Cong. & Adm. News 5787 at 5840 and 6296–97).

Because it is a bubble protecting debtors, once they petition, from an onslaught of pre-petition creditors, the automatic stay must be broad indeed. The stay must also be broad, particularly in a Chapter 7 liquidation, to promote orderly and fair distribution among creditors. Claims barred (provided that they predate the petition) consequently are defined almost exhaustively to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(4). In language highly relevant to the instant matter, the Fourth Circuit notes:

> Congress intended that the definition of claim in the Code be as broad as possible, noting that "the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to *be dealt with in the bankruptcy.* It permits the broadest possible relief *in* the bankruptcy court." *Id.* (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), S.Rep. No. 989, 95th Cong., 2d Sess. 21–22 (1978), reprinted in 1978 U.S.Code Cong. & Adm. News, 5787 at 5807–08 and 6266. The courts have consistently recognized the very broad definition to be given to claims. E.g. *Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d

649 (1985); *Robinson v. McGuigan,* 776 F.2d 30, 34 (2d Cir.1985), rev'd Sub. Nom. on other grounds, *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *Matter of M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3d Cir.1984), cert. den. 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *In re Edge,* 60 B.R. 690, 692–94 (Bkrtcy. M.D.Tenn.1986); *In re Johns–Manville Corp.,* 57 B.R. 680, 686–88 (Bkrtcy. S.D.N.Y.1986)) (emphasis added).

As the language reveals, the vast panoply of pre-petition debts is addressed *in* bankruptcy, not as separate state proceedings, such as a criminal action. As claims stayed are broad, so are the entities stayed. According to 11 U.S.C. § 101(15), governmental units, except in some situations, are among the many entities obligated to comply with the stay.[4]

■ The Casino's claims arose before Simonini filed the bankruptcy petition in January of this year. The Casino, further, had notice of the petition. The Casino falls within the § 101(15) definition of an entity and its claim is of the type automatically stayed. The Casino would therefore be required to honor the automatic stay by taking its place in the line of creditors or, if desired, by petitioning the bankruptcy court for relief from the stay pursuant to 362(b) or by objecting to dischargeability under 523 before pursuing a criminal collection.[5]

■ Just as the Casino cannot bring pre-petition claims against Simonini outside the bankruptcy process, neither can the BCDU bring claims for the debts owed to the Casino by Simonini on the Casino's behalf. BCDU is a governmental unit, clearly contemplated to be an "entity" subject to the stay under 101(15). Certain

---

4. Notably the 362(b) criminal prosecution exception, discussed *infra.*

5. The deadline for filing complaints to determine the dischargeability of debt, however, passed on April 15th, 2002.

exceptions to the automatic stay exist, however, and it is appropriate to inquire into whether one is available for the type of state criminal proceeding at issue here. These exceptions are enumerated in 362(b), which states in part:

> The filing of a petition under section 301, 302, or 303 of this title ... does not operate as a stay—
>
> (1) under subsection (a) of [362], of the commencement or continuation of a criminal action or proceeding against the debtor ....

This language makes absolutely clear that the BCDU is *not* subject to the automatic stay and that, at the first step of inquiry, the action should proceed. The Court finds no reason to construe the language of 362(b) in any manner other than as it is expressed on its face, and the clear intent is that no action termed a criminal prosecution is automatically stayed.

This conclusion, in fact, comports with the Fourth Circuit's analysis in the unpublished opinion of *In re Sylvestre*, 963 F.2d 368 (Table), 1992 WL 111853 (4th Cir. 1992).[6] In that opinion, Sylvestre filed for Chapter 7 while she owed a store $153.26 because certain of her checks were returned for insufficient funds. *See id.* at *1. The store manager, without knowing of the bankruptcy filing, swore out a criminal complaint against Sylvestre. *See id.* After larceny trials, Sylvestre initiated a contempt proceeding alleging that the prosecution violated the automatic stay. *See id.*

The Fourth Circuit observed, as this Court has, that filing a petition in bankruptcy stays actions to recover debts, but that an express exception for criminal prosecutions is provided for in 362(b). *See id.* In a statement that strongly guides this Court's rejection of Debtor's argument that 362(b) does not always exempt

criminal prosecutions, the Fourth Circuit unambiguously wrote that "[n]early every case that has examined the scope of § 362(b) has concluded that 'criminal action' includes *all* criminal actions." *Id.* (emphasis supplied) (citing *In re Alan I.W. Frank Corp.*, 19 B.R. 41, 42 (Bankr. E.D.Pa.1982)). The Fourth Circuit found the reasoning unpersuasive in *In re Padgett*, 37 B.R. 280, 284–85 (Bankr.W.D.Ky. 1983), a case deciding that criminal proceedings brought *for the purpose of collecting debt* were automatically stayed (as opposed to enjoined through another section than 362). *See id.*

■ The automatic stay is, of course, not the only harbor available to a debtor, however, and this Court is mindful of the policies behind 362 discussed *supra.* The federal intent is that bankruptcy give debtors the broad protection of a position from which they can keep creditors at bay while they attempt to get their financial affairs on track, and that limited assets are equitably distributed among competing creditors. It is axiomatic that a true criminal prosecution—with its competing goal of promoting social welfare—must always penetrate the stay and does not interfere with the policy of protecting debtors. Debtors who are found guilty after a true criminal prosecution, because of a degree of culpability, are not entitled to protection with regard to their wrongdoing. But this is merely the first step of the analysis— the 362(b) threshold inquiry.

The second step begins with the observation that it is equally axiomatic that, just as all true criminal prosecutions must proceed, most true collection actions must be stayed; this is the only way that the policy can be protected. Identifying this, the Fourth Circuit, also in *Sylvestre*, wrote that despite the complete 362(b) exception

6. Although that opinion is unpublished, the Court finds that it serves so well to shed some light on an area lacking in precedent that this represents a unique situation in which an unpublished opinion must be consulted.

for *all* "criminal prosecutions," actions shallowly termed criminal prosecutions that were *actually* debt collection actions could be enjoined under *another* Bankruptcy Code provision, after their exemption from the automatic stay:

> Clearly the use of criminal process to collect debts may frustrate the purpose of the automatic stay. The remedy, however, lies in a separate injunction. *Id.*[7]

This statement unequivocally suggests that the Fourth Circuit perceives some prosecutions as collection actions, and that as such actions they violate the policy of the automatic stay and must be held in abeyance. The method through which federal policy protecting honest debtors is reconciled with the policy supporting true criminal prosecutions of legitimate wrongdoers is to follow 362(b)'s plain meaning while extending equivalent relief through a separate injunction after a bankruptcy court has had an opportunity to examine the situation and determine whether a prosecution is for purposes of vindicating the public's need for criminal law or whether it is rather a debt collection for individual private citizens.

## II. Although the prosecution is not automatically stayed, a 105 injunction is necessary to preserve federal intent because the criminal prosecution in the instant matter is obviously a debt collection action.

### A. 362(b) allows all criminal prosecutions at the threshold, but at the second step 105 filters out all debt collection actions in sheep's clothing.

Although this Court finds that criminal prosecution is not subject to the automatic stay because of the plain meaning of 362(b), therefore, it is equally evident that debtors should be protected from debt collection actions. When a criminal prosecution resembles a debt collection strongly enough, a debtor should be able to avail himself of injunctive relief, as recognized in *Sylvestre*. *See id.* Although 362(b) is unavailable to a debtor no matter what the true nature of the criminal prosecution, section 105 is available if a court determines that the prosecution frustrates federal purpose.[8] The use of criminal prosecution to collect debts frustrates federal purpose as evidenced in two policies, both of which are evident from the face of the Bankruptcy Code.

The Court, to backtrack, balances two federal policies: the automatic stay's protection of debtors from creditors—and consequent protection of creditors' rights to a rational distribution of a debtor's assets from creditors' own inability to fairly allocate remaining assets—versus the 362(b) exception's intent to protect the collective public in general by means of criminal prosecution. But Nevada's insistence on classifying as a criminal prosecution what appears to the Court to be a collection action raises a federal preemption issue because it introduces a third state-based policy into the analysis.

In that analysis, one side consists of the delicately balanced two federal policies already described: (1.a.) balancing the need for debtor and creditor protection for fair distribution of assets with (1.b.) the need to prosecute true criminals, but to simultaneously filter out anything that is actually

---

7. The Court is troubled by the fact that counsel for the BCDU did not cite the relevant passage in its entirety, instead electing to omit this crucial elaboration.

8. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title...." 11 U.S.C. § 105(a). It is well-settled that this includes the injunctive power.

a debt collection action so as not to frustrate 1.a. The other side consists of Nevada's proposition (2) that any prosecution—even one that primarily functions to collect debts—should be wholly exempt from any kind of stay or injunction. Federal policy, in order for 1.a. and 1.b. to jibe, aims to discern the debt collection in sheep's clothing. Nevada would have this Court not look beyond the sheep suit to discern what this prosecution truly is. Since the federal policy requires that courts distinguish between different types of prosecutions—not at the 362(b) stage, where all criminal prosecutions proceed, but at the 105 injunction stage—there exists a conflict between the more subtle federal standard and the unilateral state position.

When federal and state discord must be harmonized in situations like the one before the Court, the analytical tool of federal preemption enters the field. The federal 1.a./ 1.b. balance already lends the maximum amount of deference to *true* state criminal prosecutions while protecting a debtor and his assets per the federal purpose behind the Bankruptcy Code. It nevertheless demands preservation of the overall automatic stay safe harbor from even well-disguised collection actions.

In *Worm v. American Cyanamid Company*, 970 F.2d 1301, 1304 (4th Cir.1992), Judge Niemeyer wrote:

> The principles of preemption resolve conflicts between federal and state law on the authority of Article VI of the Constitution . . . . From this Supremacy Clause flows the well-established principle that federal legislation, if enacted pursuant to the Congress' constitutionally delegated authority, can nullify conflicting state or local actions. *See e.g., Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23. . . . . [E]ven absent an express or implied congressional intent to preempt state authority in a field, state law is nevertheless preempted by operation of law to the extent that it actually conflicts with federal law. *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991); *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n.,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Several underlying presumptions have been developed to aid in discovering the intent of Congress, when it has not clearly expressed it and to determine when a conflict between state and federal law exists. . . . When we address the question of whether state law actually conflicts with federal law, we resolve the more specific inquiries of whether 'it is impossible to comply with both state and federal law' or 'whether the state law stands as an obstacle to the accomplishment of the full purposes and objectives' of federal law. *See Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). *Id.* at 1304–05.[9]

The instant matter is a situation in which Nevada's position poses an obstacle to accomplishing the full purpose of the Bankruptcy Code. Clearly, Nevada cannot be automatically stayed under 362, for 362 expressly removes all criminal prosecutions from the automatic stay. But as

---

9. The Court does not ask whether field preemption, also discussed in that opinion, is at issue because Congress, in enacting the Bankruptcy Code, clearly did not intend to assume control over all criminal prosecutions, just over bankruptcy issues. The state law at issue here is not a bankruptcy regulation, but a criminal statute. The analysis is based, therefore, not on field preemption, but on "full purposes and objectives" preemption. Of course, even if this were wholly a bankruptcy issue and field preemption applied, the analysis would not change.

intimated in the unpublished *Sylvestre* and several other published cases discussed *infra*, the purposes of the automatic stay would be frustrated if prosecutions covered what were, in reality, debt collection actions: hence *Sylvestre's* discussion of the availability of injunctive relief in some situations where federal policy would be frustrated. There is no way that *all* criminal actions can avoid a 105 injunction if *some* criminal actions are really debt collection actions, since *all* debt collection actions are subject to the automatic stay. In this situation, therefore, federal preemption resolves the inconsistency in the federal government's—and Debtor's—favor.

▇▇▇▇ Federal preemption is the primary reason the Court rejects Nevada's extensive *Younger* abstention arguments. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Debtor moves the Court to interfere with a state court proceeding, so federalist principles require the Court to determine whether it may overcome the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971), which generally precludes federal courts from enjoining pending state proceedings.

Nevada argues that *Younger* requires this Court to abstain from exercising jurisdiction. In rationalizing the holding that, absent limited exceptions, federal courts do not intervene in state proceedings, Justice Black wrote that restraining federal intervention was integral to protecting the states' right to breathing space; phrased differently:

> [to] avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a rec-

ognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' ... [T]he concept [represents] a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our United States, occupies a highly important place in our Nation's history and its future. 401 U.S. at 44–45, 91 S.Ct. 746.

For these reasons, *Younger* allows few exceptions to the doctrine of nonintervention. *See* 401 U.S. at 43, 91 S.Ct. 746. This Court pays considerable deference to federalist principles, but is forced to find that a *Younger* exception applies here.

The Supreme Court begins to unpack its reasons for reluctance to make exceptions to *Younger* by stating that:

> [t]he precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of

equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *Id.* at 42–44, 91 S.Ct. 746. This analysis directly points to the *Younger* exception that this Court has no choice but to accept: the exception for patently unconstitutional laws. The *Younger* court said that:

> "[t]here may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment. [The Supreme Court stated in an earlier case that] it is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Id.* at 53–54, 91 S.Ct. 746 (citations omitted).

As the preemption analysis, *supra,* elucidates, the Nevada statute and prosecution eviscerates the express purpose of the Bankruptcy Code by abusing the protection afforded by *Younger* when it collects debt for profit in the name of a criminal action. There is no way that the bankruptcy court can assure fair distribution of assets or organize the debtor's bankruptcy process when certain special interest creditors receive an unfair advantage through state assistance. The program at issue violates the Supremacy Clause, for the reasons already stated, making *Younger* inapplicable here.

**B. The BCDU's prosecution is a debt collection in sheep's clothing; the "core impact test"**

The Court has not yet articulated a test or factual basis for its finding that the prosecution in question is so transparent that there is no question that it is a debt collection action. Several tests exist to determine when a prosecution is really a collection action in matter similar to this, but no test is definitively favored in this jurisdiction. *See, e.g., In re Byrd,* 256 B.R. 246, 249 (Bankr.E.D.N.C.2000) (Judge Small noting that "[t]here are many thoughtful treatments of these issues in the reported decisions of other courts, but no clear path through the conflicting precedents.") This void creates great uncertainty. The Debtor urges that, in absence of clear Fourth Circuit guidance, two tests should be used in tandem to determine whether the prosecution is a debt collection action. The Court will briefly discuss these two tests, but has concluded that neither is necessary here because neither has been reliable or effective, and Nevada's mandatory restitution program is such a blatant attempt to collect debt for private persons.

*Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746 (1971) was followed by two tests that have been churned through, unfortunately without much resolution, by myriad courts over the years. In *In re Cannon,* 1997 WL 33343977 (Bankr.D.S.C.1997), the court wrote:

> Following *Younger v. Harris* two lines of cases have ensued: First, (the majority) those which require a determination of the "principal motivation" for the prosecution. If the principal motivation of the prosecutor or complainant is to collect a discharged debt, an injunction should lie. *See, e.g., In re DeLay,* 48 B.R. 282 (W.D.Mo.1984); *Matter of Butler,* 74 B.R. 106 (W.D.Mo.1985); *In re Whitaker,* 16 B.R. 917 (Bankr.M.D.Tenn. 1982); *In the Matter of Ohio Waste Service, Inc.* (Bankr.S.D. Ohio, W.D. 1982); *Johnson v. Lindsey,* 16 B.R. 211 (Bankr.M.D.Fla.1981); *In re Schultz,* Case No. 82–01089, Complaint No. 82–

0934 (Bankr.D.S.C.11/24/82); *In re Lake,* 11 B.R. 202 (Bankr.S.D.Ohio 1981). Second: the cases which have espoused what is sometimes called the Eleventh Circuit Rule—that when the prosecution has been pursued in "bad faith," an injunction should lie. *Frank v. Grainger (In re Frank),* 88–0262, C–88–0262, slip op. at p. 6 (Bankr. D.S.C.2/3/89) (JBD), *aff'd* C.A. 2:89–0564–1 (D.S.C.6/19/89).

Neither of these tests has emerged as the standard in the Fourth Circuit and the district and bankruptcy courts have no real direction in the areas these tests might cover. This is, perhaps, because neither of the tests is very workable.

The Debtor proffers one opinion that uses both tests. The Court will discuss that opinion because it offers an example of each test, and suggests one interesting attempt to cobble together a standard out of the different tests. The bankruptcy court in *Redenbaugh v. Gahle,* 37 B.R. 383 (Bankr.C.D.Ill.1984), featured facts essentially similar to the facts of the instant matter.[10] The court initially considered the creditor's motive for pursuing criminal charges, and in determining that he intended merely to collect a debt from the debtor rather than criminally punish him, wrote:

> Gahle obviously avoided participating in the Bankruptcy action to pursue his money via restitution in the criminal action. Gahle's Brief to this court admits that *a* [not *the*] motive for the criminal action was restitution. Gahle is at-

tempting to collect his debt by way of the state court criminal proceedings, *when the only place he can have the debt found to be non-dischargeable, and therefore collectible, is in the bankruptcy court.* Therefore, Gahle is enjoined from requesting or receiving any portion of his claim which was discharged in bankruptcy through action 83–CF–23. *Id.* at 387 (citations omitted) (emphasis and editorial supplied).

The bankruptcy court, despite blocking the creditor from even seeking restitution, denied the debtor's request to enjoin the criminal prosecution in its entirety:

> There is no suggestion that the States Attorney ... initiated or has proceeded with [the action] in bad faith or for any reason other than to promote the interests of the People of the State of Illinois. The Court declines to enjoin the State's Attorney ... from prosecuting 83–CF–23. The Court, however, deems that Section 524(a)(2), prohibits the State's Attorney from recommending to the State Court that [the debtor] pay restitution as part of the sentence or as a condition of probation. *Id.*

The bankruptcy court thus applied both tests by distinguishing the prosecution from the restitution.

 This Court rejects both the approach of looking at whether the motivation for the prosecution is debt collection and the approach of asking whether the prosecution is in bad faith for several reasons.[11] First, the motivation analysis is so

---

**10.** Except that the debtor had already been discharged in that case (so a 524(a)(2) injunction was available against the prosecution, which it is not here). That debtor also requested 105 relief, which is of course a possibility in the current action.

**11.** It also rejects *Redenbaugh's* tandem approach, which seems to mischaracterize the true nature of a criminal prosecution by inex-

plicably switching between two tests—neither of which has much analytical merit—to avoid policy analysis, and to shrink from the specter of stepping on state toes regardless of the mandates of the Constitution. Although this Court vigilantly recognizes state autonomy where consistent with federal law, the Supremacy Clause's mandate demands that the Court apply it when state and federal law are

vague as to be unworkable. For example, as underscored in the passage quoted *supra*, courts are unclear as to whether debt collection must be *a* primary motivation or *the* principal motivation. States will always be able to contrive all sorts of explanations for prosecution. The real inquiry should be not motivation, but effect or impact on debtors. Courts should ask whether the prosecution looks at core like debt collection, regardless of its motives. They should be guided by the policy balance of facilitating real criminal prosecutions (362(b)) while blocking mere creditor actions. They should look at impact on debtor and the prosecution's core as demonstrated by objective fact, which, unlike motivation, can be measured in objective fact, to decide whether the wolf under the sheep ensemble seeks to recover funds from a debtor or, instead, seeks to punish the criminal for violating state policy.

Second, the "bad faith" analysis seems inappropriate because the courts generally have no evidentiary—or even logical—basis for concluding that a prosecution that is mostly motivated by debt collection is necessarily one brought in "bad faith." Deference to the states demands that courts not assume or impute bad faith in the lack of clear evidence, of which none exists here or in most situations. The "bad faith" test is, further, too far from the policy that both of these tests should exist to implement in the first instance. Whether an act is done in bad faith or not has nothing to do with the question of whether an act frustrates the Bankruptcy Code's policy of protecting debtors and assets from a feeding frenzy, thereby promoting fair distri-

bution. Similarly, bad faith has nothing to do with whether something is a prosecution or instead a debt collection action. Simply put, "bad faith" has no role in the appropriate inquiry.

The Court cannot play the role of mere critic by rejecting both tests without proposing a new, workable test that is wholly guided by the policy of the Bankruptcy Code as expressed on its face. The Court is loath to completely fashion a new test, but finds it must do so in an effort to provide future courts with express guidance and administer justice fairly on this occasion. The Fourth Circuit surely will provide further guidance if needed, but as of today there is no statement from Richmond. The Federal government's message is fortunately expressed on the Bankruptcy Code's face.

A "core impact" test is the most direct mode of analysis that serves both the federal and state policies interlacing this Opinion. Under this approach, the Court looks at the record to determine the core nature of the criminal prosecution's impact on the debtor. If the core essence of the prosecution impacts the debtor mostly in the manner of a creditor's attempt to violate an automatic stay to collect funds, the prosecution is actually a debt collection that violates automatic stay policy and must be enjoined under 105.[12] On the other hand, if the core of the prosecution has the effect of treating the debtor like a criminal defendant, is designed to accomplish purposes that do not interfere with the Bankruptcy Code's policy, and—most

---

inconsistent. No test is appropriate that does not realize this.

12. This can be determined from the record by indicators of the relationship between District Attorney and creditor (e.g. whether there is an agency relationship, whether collected funds flow straight back to creditor) and

treatment of defendant (e.g. whether the prosecution stops if full payment is made, whether the state comes knocking like a collection agency using the threat of prison as opposed to a black mark on the credit rating for leverage).

importantly—*would not be eviscerated if the restitution element was removed*, then the prosecution is actually a criminal prosecution that benefits from 362(b) and should not be enjoined.[13] One approach to testing evisceration is to ask whether a statute makes full restitution *mandatory*, or just part of a comprehensive panoply of penal remedies.

The core impact test works at every policy level and follows what little concrete jurisprudential guidance is available. The test serves judicial interests by giving lawmakers and litigants an unambiguous measure of whether an action termed a criminal prosecution will be enjoined under 105. A determination of what the prosecution is at core, and how it impacts a debtor, is readily ascertainable in an objective and straightforward manner by referencing the face of the record. It serves state interests and the federal policy of promoting true prosecutions by assuring that when an action impacts a debtor as a criminal prosecution, no injunction will lie. But it simultaneously serves federal interests by protecting a debtor from anything that impacts a debtor in the manner of a collection, no matter what it is called or what clothing it dons.[14] This standard allows federal courts to properly respect states' rights while avoiding federal preemption problems by hopefully compelling states to critically examine their procedures while keeping in mind the question of what effect on a defendant they are really trying to bring about.

Applying the core impact test to the instant prosecution shows that this prosecution clearly impacts the debtor in much the same manner as a debt collection would by emphasizing restitution recovery. To accomplish this analysis the Court need look no further than the Exhibits attached to the Affidavit of Daniel E. Ahlstrom, submitted by counsel for the BCDU. The benefit of this approach is that it need read nothing into the record, and relies on the record's face—much as the approach relies on the Bankruptcy Code's face for policy guidance.

Some passages suggest, with little ambiguity, that the prosecution would indeed be eviscerated without the remunerative function. Indeed, in the instant case, the criminal prosecution does not stand without this function. In the Office of the District Attorney's Warning of Criminal Charges mailed to Simonini and dated August 24th, 2001, the District Attorney states, in part:

> Within the next few days, you run the risk of being summoned to appear in court or have a warrant issued for your arrest on the charges of passing bad checks. If you wish to avoid having to appear in court on those charges, you must appear IMMEDIATELY at our office to pay off all the bad checks we are holding. All restitution must be in the form of a MONEY ORDER or CASHIER'S CHECK only. *We will then stop processing of those charges.* [A statement of debt owed follows.] Make your MONEY ORDER payable

---

13. No matter what the outcome of the test, of course, anything deemed by a State a "criminal prosecution" qualifies for the 362(b) exemption. The consideration here is merely whether injunctive relief is available.

14. This raises an ancillary fairness question of why some special interest creditors should benefit from the weight of the state in at-

tempting to collect a debt while the majority of ordinary creditors must comply with federal law by working with the automatic stay and discharge. When a state allows itself to serve as debt collector for private interests, it manipulates the federal deference accorded it by exploiting that deference for the commercial advantage of some lobbies.

to: Clark County District Attorney's Office For $440,125.00. (Ahlstrom Aff. Ex. 4.) (underlining emphasis supplied, capitalization emphasis in original.)

Not only is the core of the action restitution, this suggests, restitution is the sole purpose of the action, for the action is dropped upon timely restitution. The District Attorney's prosecution impacts Simonini exactly in the manner that a direct action by the Rio Suite Hotel & Casino would, and it manipulates the purpose of 362(b) to allow the Hotel & Casino to avoid the automatic stay by, effectively, retaining the BCDU to collect debt.

Not only does the BCDU, as collection agency, offer a statement and payment due date (with the unfortunate consequence not of late fees for missing payment deadlines, but of "debtor's gaol"), but it makes payments easy! For a "MONTHLY MINIMUM PAYMENT OF $73, 375.00", Mr. Simonini can pay in *installments*, with the promise of no prosecution after full payment. (Ahlstrom Aff. Ex. 6.) Again, the Court is baffled as to how the core of the prosecution can be perceived as a means of vindicating the general public interest—as opposed to the isolated special interests of the casinos— when the criminal prosecution disappears upon prompt payment of the debt (or installments thereof). The BCDU acts not only as collection agency, but as "heavy" for the Casino. Hence, in a July 31st letter from Rio Suite Hotel and Casino to Mr. Simonini: "Unless you make restitution on [the checks] by 08/10/01 we will submit these documents to the Clark County District Attorney and a bench warrant may be issued for your arrest." (Ahlstrom Aff. Ex. 6.) The message is transparent: pay (regardless of bankruptcy) or go to jail. Taken in sum, the documents place the Debtor in a virtual debtor's goal by holding the threat of prosecution over

his head until he pays in full, at which time the prosecution threat subsides.

The record leaves no doubt that the core of the prosecution is restitution, with the sole purpose of protecting the casinos' special interests by giving them a legal box— if not a literal jail—they can place debtors in until payment. Although this might otherwise be said to have the general benefit of protecting the people of Nevada from bad checks, the fact that the threat of prosecution disappears upon payment raises serious question about who exactly this scheme helps. Since the prosecution is simply a collection action, an injunction is proper.

The Court notes with interest the "Bad Check Complaint Form," where the complainant states: "I (We) hereby authorize the Clark County District Attorney or it's [sic] designee as my agent to endorse and cash any negotiable instrument tendered by or on behalf of the drawer of the check presented for collection by this request." (Ahlstrom Aff. Ex. 3.) This shows that: (1) the DA is the *agent* of the creditor *for collection purposes,* and (2) that payment collected goes directly to the creditor. This flies in the face of the Bankruptcy Code's purpose of excepting true criminal prosecutions and allowing recovery of funds for punishment, not solely restitution. 523(a)(7) states that a discharge in bankruptcy will not relieve the debtor from any debt that is "for a fine, penalty, or forfeiture payable to and *for the benefit of a governmental unit,* and is *not for compensation for actual pecuniary loss.*" 11 U.S.C. § 523(a)(7) (emphasis supplied). This makes sense as a statement of policy, when taken with 362(b): funds may be recovered, despite of discharge or automatic stay, subject to the underlined conditions: they must be for the government and they cannot be for compensation. It is painfully apparent from the core impact

analysis that the funds recovered go almost directly to the creditor, and that they are intended to restore the creditor to the pre-fraud position. This completely frustrates the express language of the Code.

This analysis is demanded by *Kelly v. Robinson*, 479 U.S. 36, 51, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). There, the Supreme Court did what the BCDU and Casino might like the Court to do here: they found that an order of restitution was exempted from discharge under section 523(a)(7). The facts were different. A debtor plead to larceny, and was ordered to pay restitution as a condition of probation. The Probation Office failed to timely object to discharge when she filed for Chapter 7 protection. Using 523(a)(7), both the Probation Office and Supreme Court decided that the payments were non-dischargeable.

But, as always, the reasoning on the specific facts was integral. Focusing on the limitations in 523(a)(7), the Supreme Court stated that "the decision to impose restitution generally *does not turn on the victim's injury, but on the penal goals of the State* and the situation of the defendant." *Id.* at 52, 107 S.Ct. 353.[15] In jagged contrast, the BCDU's approach could not turn more on the victim's injury. As the authorization in the complaint form shows, funds collected are channeled to the creditor to make it whole. And the prosecution stops, if payment is made early enough, once that happens.

In the Connecticut scheme in *Robinson*, the statute authorized the judge to impose any of eight specified conditions on probation, only one of which was restitution. *See id.* (citing Conn. Gen.Stat. § 53a–30(a)(9) (1985)). And, far from mandating that the entire amount be collected, the statute allowed the court in its discretion to demand that the debtor was to "make restitution, in amount he can afford to pay or provide in a suitable manner, for loss of damage caused thereby and the court may fix the amount thereof and the manner of performance." *Id.* The Connecticut statute "does not require imposition of restitution in the amount of the harm caused," but "provides for a flexible remedy tailored by the defendant's situation." *Id.* at 53. In other words, the fine must be penal in nature, not an attempt necessarily to recover the full contractual amount. The Fourth Circuit has found that when a debt owed to the state for unpaid obligations was more akin to a contractual obligation, rather than penal, the amount was not exempted from discharge. *See Virginia v. Collins*, 173 F.3d 924 (4th Cir.1999). The Fourth Circuit surely intends that such fines be used for penal purposes, for example as a mere condition of probation, only when the fines operate "hand-in-hand with the penal and sentencing goals of the criminal justice system." *Thompson v. Virginia*, 16 F.3d 576, 580 (4th Cir.1994). The statute discussed in *Thompson* allowed "the trial court to establish a program which would allow those who are unable to pay their fines and costs to satisfy their obligation through the performance of community service." *Id.* These cases insist on trial court discretion as to the recovery of funds, absolutely to assure that the justice system avoids becoming a debt collection mechanism. Discretion is necessary to work with the facts of each case to assure that the sentence is penal, not in the nature of debt collection.

As if to ensure that the funds be collected, Nevada allows its trial judges no such discretion:

---

**15.** To distinguish, fraud-related debts under 523(a)(2), (4), and (6) have to be determined

in bankruptcy court within the 523 60 day period. *See* 523(c)(1).

[A] person who willfully, with an intent to defraud, draws or passes a check or draft ... [d]rawn upon any real or fictitious person, bank, firm, partnership, corporation, or depositary, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the state during a period of 90 days, is in the amount of $250 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. *In addition to any other penalty, the court shall order the person to pay restitution.* NRS § 205.130(1) (emphasis supplied).

To put it bluntly, the statute appears to be aptly paraphrased as stating: "No matter what you do, get this defendant to make full restitution." This is different from the Connecticut statute in *Robinson* in that *Robinson* contains the indicia of what might be called "criminal prosecution core," its impact is to treat the target individual like a criminal defendant and punish him in a flexible manner, tailored to his crime and the penal needs of the state. The Nevada statute, contrastingly, has a "debt collection core." It emphasizes collection no matter what, and correspondingly impacts the target individual like a debtor, unprotected by the automatic stay. It is simply a means of working around federal law. This, the Supremacy Clause prohibits.[16]

16. *The Court wishes to emphasize that this entire issue could have been avoided if the Casino had simply sought relief through the bankruptcy process, as by seeking a declaration of non-dischargeability* under, for instance, 523(a)(2), (4), or (6). Instead, by trying to collect debt under the guise of a state criminal prosecution, the Casino asks the Court to promote a situation in which most creditors would be held off while certain favored credi-

*Relief*

IT IS THEREFORE ORDERED that the Motion for a Permanent Injunction in the prosecution and extradition is hereby GRANTED. IT IS FURTHER ORDERED that all other pending motions are hereby DENIED.

tors could rush in and grab all the assets. This specter would arrantly defeat the federal purpose of using the automatic stay to promote fair distribution to all creditors.

A central purpose of the Bankruptcy Code is to marshal creditors and organize distribution. When creditors circumvent that marshaling process, preventing the bankruptcy judge from organizing all the creditors, the interests of none are served.