IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 16, 2019 Session

**STATE OF TENNESSEE v. BRIJESH MUKESH DESAI**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-2112     Cheryl A. Blackburn, Judge**

_____

**No. M2018-01810-CCA-R3-CD**

_____


After a trial, a Davidson County jury found Defendant, Brijesh Mukesh Desai, guilty of theft of services valued at $1,000 or more but less than $10,000. The trial court sentenced Defendant as a Range I standard offender to four years in the Tennessee Department of Correction with a release eligibility of thirty percent. On appeal, Defendant argues that his conviction violates his constitutional right not to be imprisoned for a civil debt, that the trial court lacked subject matter jurisdiction, that the indictment was fatally flawed, and that the trial court improperly admitted evidence at trial. After a thorough review of the record and applicable case law, we affirm the judgment of the trial court.

**Tenn. R. of App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

John H. Morris, Nashville, Tennessee, for the appellant, Brijesh Mukesh Desai.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

A Davidson County Grand Jury indicted Defendant for theft of services valued at $1,000 or more but less than $10,000 in count one and of passing a worthless check in counts two, three, and four. Defendant filed a motion to dismiss, and the trial court

granted his motion as to counts three and four and denied his motion as to counts one and two.

At trial, Kenneth Randolph testified that he was the general manager for Anthem Nightclub ("the club") from 2013-2015. Mr. Randolph also participated in artist and guest relations and provided music entertainment for the club. Mr. Randolph said that Defendant contacted him on November 3, 2014, regarding a party he wanted to plan for November 15, 2014. On November 10 and 11, Defendant texted Mr. Randolph regarding the number and types of bottles of alcoholic beverages he would need for his party. On November 12, Defendant requested a custom-designed canvas backdrop, measuring eight by ten feet, which Mr. Randolph indicated would cost $600. On November 12, Mr. Randolph informed Defendant that the total cost of the party would be $9,600 and told Defendant that he would receive two bottles of liquor for free.

On November 13, Defendant contacted Mr. Randolph for an update on the status of the canvas backdrop, and on November 14, Mr. Randolph texted Defendant a picture of the completed backdrop. Defendant did not seem pleased and wanted Mr. Randolph to make several changes, including fixing a misprinted date. Mr. Randolph testified that, because the backdrop was already complete and the printer was unavailable, Mr. Randolph offered not to charge Defendant for the backdrop and stated that they would not use it for the party. However, Defendant insisted that Mr. Randolph fix the backdrop and use it. Defendant texted Mr. Randolph, saying, "[Y]ou should get a discount from the [printer] before I pay for the mistake." Defendant also asked Mr. Randolph, "Is there a markup on it to me[,] or am I paying what they're charging you? It should be discounted for sure for the mistake." When Mr. Randolph responded that he would receive a "big discount," Defendant texted, saying, "Cool we can do the 9k for now." Mr. Randolph testified that Defendant confirmed the number of party guests at sixty-one. Defendant verified that he would send a list of music to Mr. Randolph by 3:00 p.m. on the day of the party.

On the afternoon of November 15, 2014, Defendant texted Mr. Randolph to request a credit card authorization form. Mr. Randolph testified that he sent Defendant the form and that Defendant filled it out and returned it prior to the party. At 11:55 p.m. on the night of the party, Mr. Randolph texted Defendant to verify the "CCV" number for his credit card. Defendant did not respond. Mr. Randolph stated that, during the party, Defendant and his guests consumed approximately thirty bottles of alcohol. On the morning of November 16, 2014, Mr. Randolph informed Defendant that his credit card information had been declined and requested that Defendant verify the correct numbers. Defendant texted, "[T]he idiot at the limo company kept trying to run my card for $112,500. Waiting on Amex to sort it out and then will let you know and you'll be able to run and close out the 9k[.]" That afternoon, Defendant asked Mr. Randolph to save

any unopened bottles from the party "for next weekend." On the evening of November 16, 2014, Mr. Randolph texted Defendant again, asking, "When do you think that stuff will get sorted with Amex?" Defendant responded that the error should be corrected by the following morning and that he wanted "to repeat last night for next Saturday[.]"

On November 17, 2014, Defendant texted Mr. Randolph to inform him that a new American Express card would arrive by the following day. Defendant asked, "Want me to drop off a check . . . or text you the front and back of the new card in the morning?" Mr. Randolph responded that a text on the following morning would suffice. On the morning of November 18, 2014, Defendant texted Mr. Randolph to tell him that the new American Express card arrived at his home and that he would send the card information when he got home between 5:00 and 6:00 p.m. that evening. At 7:44 p.m. on November 18, Mr. Randolph texted Defendant, stating that he "need[ed] that payment tonight, sir. I'll be in serious sh*t if I don't. Please send me the CC info when you have it." Mr. Randolph testified that his employers were upset because he was unable to recoup the cost of Defendant's party. Two hours later, Mr. Randolph texted again, "Brother, I need that information."

The following morning, November 19, 2014, Defendant responded to Mr. Randolph that he would send his new credit card information by noon that day. Defendant told Mr. Randolph that he could also "run [the credit card] for an additional 5 [thousand dollars] for this Saturday." Late that afternoon, Defendant texted Mr. Randolph that his assistant would "drop 9K cash tomorrow morning at 11 a[.]m[.]" Defendant told Mr. Randolph that he was sending a cash payment because his credit card still had the incorrect charge on it from the limo company. Mr. Randolph testified that Defendant's assistant never brought money to the prearranged meeting place.

The following morning, November 20, 2014, Defendant texted Mr. Randolph and said he would send payment by cashier's check because Defendant learned that an attorney was now involved. Defendant made arrangements to meet Mr. Randolph with a cashier's check but never arrived at the prearranged location. Just after noon on November 20, Defendant texted Mr. Randolph and offered to wire the payment to Mr. Randolph. The funds never arrived.

Approximately one month later, on December 17, 2014, Mr. Randolph texted Defendant again, "What's the deal here man? Everyday [sic] you say the money is going to be deposited and everything, and everyday [sic] it isn't. Meanwhile I'm stuck paying a part of your bill. What's really going on?" Mr. Randolph testified that he had paid the servers for Defendant's party from his personal funds and had taken a pay cut to try to "make whole with the company[.]" On December 18, Mr. Randolph texted Defendant that the club's accountant would be "filing charges" the next day. On December 22,

2014, Defendant again offered to bring a cashier's check to Mr. Randolph to cover the cost of his party. Defendant never met with Mr. Randolph.

On cross-examination, Mr. Randolph testified that he believed that Defendant had made some payments towards his debt. Mr. Randolph said that he did not verify Defendant's credit card prior to the evening of the party and that he did not require Defendant to submit a deposit. Mr. Randolph said he "passed the matter" of Defendant's overdue bill to Kevin Woods, who helped the club with legal and financial matters.

Kevin Woods testified that, beginning in September 2014, he was an independent contractor with Status, LLC, (doing business as Anthem Nightclub) for approximately nine months, handling the financial aspects of the club. Mr. Woods testified that Mr. Randolph alerted him to a problem with Defendant's payment for his November 15, 2014 party. Mr. Woods said that because Defendant did not pay his bill, the servers for his party did not get paid. Mr. Woods testified that the first contact he made with Defendant to procure payment was on November 20, 2014. On that day, Mr. Woods received a personal check from Defendant from a Fidelity account. Mr. Woods stated that he contacted Fidelity to inquire as to whether there were funds in Defendant's personal account, and Fidelity informed him that the account was empty. Mr. Woods then contacted Defendant, who told Mr. Woods that the Fidelity account was "under audit." Mr. Woods said that he provided Defendant with wiring instructions, but the funds never arrived. On December 3, 2014, Mr. Woods provided Defendant a letter via certified mail requesting prompt payment and explaining the crime of passing a worthless check.[1] After receiving no payment from Defendant, Mr. Woods filed a police report on December 29, 2014.

---

[1] Mr. Woods's December 3 letter stated, in pertinent part:

Under T[ennessee] C[ode] A[nnotated] [section] 39-14-121(b), the [check] passer's fraudulent intent or knowledge is inferred if payment was refused by the bank and the passer of the check fails to make good within [ten] days after receiving notice of the refusal.

As stated earlier in this letter, your check was refused by your bank, and this letter serves as notice to you that the check was refused. In accordance with the statute, this notice has been mailed to you using certified mail with return receipt requested.

If we do not receive the funds within [ten] days in electronic available funds, cash, or a cashier's check, we will file a police report with the Metro Nashville Police Department and will seek felony criminal theft charges with the Davidson County District Attorney's Office. In addition, we will file a civil action against you in Davidson County General Sessions Court alleging breach of contract, conversion, and fraud, and will seek the maximum amount allowed by law.

Mr. Woods testified that, on January 26, 2015, Defendant delivered another personal check, this time from a Scottrade account. Again, the check was returned for insufficient funds. Mr. Woods stated that Defendant delivered a third personal check on February 2, 2015, and that it also was returned for insufficient funds. By the time the club closed permanently in February 2015, Defendant had not paid any funds towards his debt.

On cross examination, Mr. Woods testified that Status, LLC, was administratively dissolved in 2015. After reviewing a document from the Tennessee Secretary of State, Mr. Woods noted that the administrative dissolution date for Status, LLC, was August 9, 2014. Mr. Woods explained that, while Status, LLC, did not have legal protection from the State after August 9, 2014, it was still licensed to do business in Nashville until February 2015. Mr. Woods said that the club was "paying liquor and sales taxes, [and it was] filing tax returns. [It was] actively operating a business in Davidson County and Nashville, Tennessee." Mr. Woods testified that, in August 2015, Defendant paid Status LLC, $1,450 in cash and that he subsequently made one or two additional $500 payments. Mr. Woods stated that these payments were "irrelevant" because the club was already out of business. Mr. Woods also stated that, despite his warning in his December 3 letter that Status, LLC, would pursue civil action against Defendant, no lawsuit was ever filed.

Anita Prather testified that she worked for Metro Nashville Police Department as a detective in the fraud unit. Detective Prather stated that, after Mr. Woods filed a police report, she was assigned to investigate the case. She contacted Mr. Woods on December 30, 2014, and subsequently contacted Defendant. Detective Prather said that Defendant informed her that "this was a civil matter[,]" at which point she "advised him [that] it was not." Defendant told Detective Prather that the reason his November 20, 2014 check was returned for insufficient funds was due to "some kind of fraud on his account[.]" Defendant assured Detective Prather that he would "work it out with" the club.

Detective Prather then contacted Mr. Woods, who told her that Defendant made plans to meet with Mr. Woods to make payment, but Defendant "didn't show." Detective Prather testified that, on two later occasions, Defendant attempted to pay Mr. Woods but that both of those checks were written on accounts with insufficient funds. Detective Prather requested a subpoena for Defendant's accounts, and through her investigation, she discovered that the Fidelity account from which the November 20 check was written was never funded. Detective Prather testified that, upon examination of the bank records, she discovered that neither of the two Scottrade accounts from which Defendant wrote the January 26 and February 2 checks ever had more than about $1,400, far less than the $9,000 Defendant owed the club.

On cross-examination, Detective Prather agreed that the circumstances are narrow under which writing a check with insufficient funds is considered a crime rather than a civil matter. She confirmed that she told Defendant to "go and pay [the club] the money that [he] owe[d] them."

At the conclusion of the State's proof, Defendant moved to dismiss counts one and two, and the trial court granted his motion as to count two, stating that "the services were already obtained and then [Defendant] wrote the worthless check. So the worthless check [statute] doesn't apply." The trial court denied Defendant's motion as to count one, stating that Defendant's intent should be determined by the jury. The trial court then conducted a *Momon* colloquy, and Defendant chose not to testify.

Following deliberations, the jury found Defendant guilty of theft of services with a value of $1,000 or more and less than $10,000. After a hearing, the trial court sentenced Defendant as a Range I standard offender to four years in the Tennessee Department of Correction, with a release eligibility of thirty percent. Defendant filed a motion for a new trial, and the trial court denied the motion after a hearing. This timely appeal follows.

## **Analysis**

### *I. Constitutional Argument*

Defendant argues that his prosecution for theft of services violates Article I, Section 18 of the Tennessee Constitution, which prohibits incarceration for a civil debt. Defendant contends that, because his civil debt remains, Defendant did not "take[] or obtain[]" services; thus, "the intent to defraud is nonexistent as a nullity" and "theft of services is a legal impossibility." Defendant asserts that the State's prosecution was an improper use of the criminal court as a "collection service."

The State responds that Defendant waived this issue by failing to make a contemporaneous objection at trial and by failing to preserve this argument in his motion for a new trial. The State also contends that Defendant fails to argue plain error and thus has not carried his burden. Finally, the State asserts that, when Defendant argues that this is a civil matter prosecuted in a criminal court, Defendant improperly conflates the crimes of passing a worthless check and theft of services.

### A. Standard of Review

Initially, we note that Defendant and the State posit different standards of review for Defendant's constitutional argument. The State asks for plain error review because Defendant did not preserve his argument below. Defendant concedes that he failed to preserve his argument below; however, Defendant argues that this court should evaluate

his case under plenary review because "the [c]onstitutional question and validity of the indictment in the instant case invoke, among other things, subject matter jurisdiction." Therefore, he argues that the waiver rule in Tennessee Rule of Appellate Procedure 3(e) does not apply. *See State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) ("The waiver provision of Rule 3(e), however, does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused.")

To determine whether Rule 3(e) applies, we must first determine whether the prosecution would be dismissed if Defendant's constitutional challenge was meritorious. If Defendant's criminal conviction under the theft of services statute was for a civil debt, his conviction would be unconstitutional as applied. Tenn. Const. art. I, § 18. His conviction would be void, and the charges would be dismissed. Thus, we will analyze Defendant's claim under plenary review.

## B. Conviction for a Civil Debt

Article I, Section 18 of the Tennessee Constitution states that "[t]he [l]egislature shall pass no law authorizing imprisonment for debt in civil cases." Tenn. Const. art. I, § 18. Criminalizing the fraudulent acquisition of services does not violate Article I, Section 18 of the Tennessee Constitution. *State v. Yardley*, 32 S.W. 481 (1895). Fraudulent acquisition of services "consists, not in the creation of a debt, nor in its nonpayment, but rather in the fraud through which credit may be procured or payment evaded." *Id*. at 484.

Defendant relies on *State v. Newsom*, 684 S.W.2d 647 (Tenn. Crim. App. 1984), in a circuitous argument against his theft of services conviction. First, Defendant argues that because he "utilized" the club's services prior to his failure to pay and because the debt at issue was preexisting at the time he attempted payment, then he did not "obtain" anything except a civil debt. Thus, he argues, the worthless check statute does not apply. *See id*. at 649. Then, Defendant asserts that, because "there was no passing of [a] worthless check[,] . . . there was no theft [of services] and, therefore, there was no crime." Defendant appears to argue that, if the State cannot establish that Defendant was guilty of passing a worthless check, then it has no recourse in pursuing charges of theft of services. As the State argues, this conflation is incorrect.

The defendant in *Newsom* was convicted under our prior "bad checks" statute, Tennessee Code Annotated section 39-3-301 (1984). 684 S.W.2d at 648. This statute was subsequently replaced by the current "worthless checks" statute, Tennessee Code Annotated section 39-14-121. 1989 Tenn. Pub. Acts, ch. 592 § 1. Section 39-14-121 requires fraudulently issuing or passing "a *check or similar sight order* for the payment of money for the purpose of . . . obtaining money, services, labor, credit, or any article of

value[.]" Tenn. Code Ann. § 39-14-121(a)(1)(A) (2014) (emphasis added); *see also Newsom*, 684 S.W.2d at 649. The court in *Newsom* held that a defendant could not be convicted of passing a worthless check for a preexisting debt. *Newsom*, 684 S.W.2d at 649 (stating that "[t]he general rule is, where the statute specifies the obtaining of something of value as an element of the offense, the giving of a worthless check in payment of a preexisting debt is not a violation of the statute. Since the debt remains unpaid[,] the maker of the check did not obtain anything of value from the payee and did not give the check with intent to defraud.").

Here, while Defendant was initially charged with three counts of passing a worthless check under section 39-14-121, the trial court eventually dismissed all three counts, relying in part on *Newsom*. Defendant asserts that the trial court's dismissal of the worthless check indictments nullifies the fraudulent intent required for the theft of services conviction. Defendant argues that the trial court erred in denying his motion to dismiss count one because count one was dependent on counts two through four. Defendant contends that the definition of "fraudulent intent" in both the worthless checks statute and the theft of services statute must be defined in the same way. However, a plain reading of the statutes shows that the theft of services statute is broader than the worthless checks statute because the theft of services statute does not require issuing a form of payment but only requires making fraudulent *promises* to perform. The *Newsom* court did not address whether a defendant may fraudulently induce services in other ways under other statutes. The theft of services statute and worthless check statute are separate and distinct. Thus, Defendant's reliance on *Newsom* to contest his theft of services conviction is misplaced. As the State so aptly expressed, Defendant has already "squeezed the juice from *Newsom*."

Defendant also argues that the club simply extended credit to him by providing services prior to receiving payment, and because the debt remains, the remedy is exclusively civil. In *State v. Kathryn Rockwell*, this court found that imprisonment for obtaining property by means of false pretenses in obtaining credit did not violate Article I, Section 18 of the Tennessee Constitution. No. C.C.A. 87-120-III, 1988 WL 13992, at *1 (Tenn. Crim. App. Feb. 24, 1988), *perm. app. denied* (Tenn. May 31, 1988). The defendant in *Kathryn Rockwell* made false statements to the victims to induce them to extend her credit so she could buy their store and inventory, and then she depleted the stock and defaulted on her loan. *Id*. A jury found that the victims "relinquished the stock and inventory on the false representation that the [defendant] would be able to pay for the store and its contents[.]" *Id*. This court affirmed the defendant's convictions, stating that "[t]he contention that this whole prosecution was the using of the State's penal statutes 'as a cloak for an imprisonment for debt' is unfounded" because "the legislative intent was 'to punish the debtor for his fraud, and not his debt.'" *Id*. (quoting *Yardley*, 32 S.W. at 484).

In *State v. Gipson*, our supreme court explained the difference between the mere creation of a civil debt and the fraudulent intent required for false pretenses under Tennessee Code Annotated section 39-3-901[2] when a defendant failed to pay for his meal at a restaurant:

> The evidence presented shows one of two things, depending upon the intent of the defendant. If, at the time he ordered and consumed the food, he had no criminal intent to not pay for the same but was acting out of inadvertence, not realizing that he was without funds sufficient to pay for the meal, nothing but a civil debt was created. On the other hand, if at the time the defendant ordered and consumed the food he was aware of the fact that he was without funds for which to pay for the same but, nevertheless, proceeded, impliedly, to falsely pretend that he was buying the food and would pay for it, the case was one of "pretended buying" and he was guilty of obtaining personal property and services by false pretenses, the offense proscribed in T[ennessee] C[ode] A[nnotated section] 39-3-901.

*State v. Gipson*, 656 S.W.2d 371, 373 (Tenn. 1983).

Similarly, Defendant's conviction under Tennessee Code Annotated section 39-14-104 is not based on his creation of a debt but instead is based upon his fraudulent inducement of the club to provide services for which he had no intention to pay. The State provided significant evidence that Defendant never intended to pay for the services that he received on November 15, 2014. Defendant offered unfulfilled promises to pay thirteen times:

November 14: Defendant agreed to pay $9,000.

November 15: Defendant again agreed to pay $9,000.

November 16: Defendant promised to "sort out" his credit card problems.
November 17: Defendant promised that a new credit card was being "overnighted" to Defendant.

November 18: Defendant promised to send new credit card information to Mr. Randolph "when [Defendant] [got] home" from work.

---

[2] Tennessee Code Annotated section 39-3-901 was later consolidated into the current theft statute. *See* 1989 Pub. Acts, c. 591, § 1.

November 19, morning: Defendant promised to send new credit card information via email.

November 19, afternoon: Defendant promised to have his assistant "drop of 9k cash tomorrow morning[;]" Defendant claimed credit card issue was never resolved.

November 20, morning: Defendant promised to pay via cashier's check made payable to Anthem Nashville.

November 20, 11:20 a.m.: Defendant promised Mr. Randolph that he would arrive with a cashier's check in thirty-five to forty-five minutes.

November 20, 12:36 p.m.: Defendant promised to pay via wire transfer.

December 17: Defendant again promised to pay via wire transfer.

December 18: Defendant promised to "meet up with" Mr. Randolph to pay.

December 22: Defendant promised to pay via cashier's check.

Defendant also issued four worthless payments. On November 15, Defendant offered a credit card which was declined. On November 20, January 26, and February 2, Defendant issued worthless checks. Therefore, Defendant was not prosecuted for acquiring a civil debt but for fraud.

Defendant also relies on *In re Whitaker*, a case from the United States Bankruptcy Court for the Middle District of Tennessee, to support his contention that the "ultimate goal[] of this criminal prosecution" is to "compel the payment of a civil debt." In *In re Whitaker*, the bankruptcy court enjoined a district attorney general and a creditor "from taking any action to further prosecute the debtor for" passing a worthless check under Tennessee's prior worthless check statute.[3] *In re Whitaker*, 16 B.R. 917 (Bankr. M.D.

---

[3] Tennessee Code Annotated Section 39-1959 stated that "[i]t shall be unlawful for any person with fraudulent intent to make or draw or issue or utter or deliver any check, draft, or order for the payment of money drawn on any bank, corporation, firm or person for the purpose of obtaining money, or any article of value, or to obtain credit, knowing at the time of making, drawing, uttering or delivering said draft, check or order that the maker, or drawer, has not sufficient funds in, or on deposit with, such bank, corporation, firm or person, for the payment of such check, or draft, or order in full, and all other checks, drafts or orders upon such funds then outstanding." *See Whitaker*, 16 B.R. at 919 n. 1.

Tenn. 1982). The debtor issued a check to the creditor for $5,000 when he had only $200 in his bank account. *Id*. at 918. However, the debtor informed the creditor that he was in the process of selling property, at which time the check would be honored. *Id*. The debtor's property sale was never consummated, and he informed the creditor that the check was therefore "bad." *Id*. Later, the debtor was indicted "for the offense of drawing a check without sufficient funds[,]" but the assistant district attorney general offered to dismiss the charge if the debtor would pay restitution. *Id*. at 920. The *Whitaker* court opined that "[t]he district attorney's offer 'to nolle the criminal case upon restitution and cost' indicates that the motivation of this prosecution was not punishment but the recovery of a discharged debt." *Id*. at 922. Thus, the bankruptcy court permanently enjoined the district attorney general from prosecuting the debtor for passing a worthless check. *Id*. at 923.

Again, Defendant's reliance on *In re Whitaker* is misplaced. Like *Newsom*, *In re Whitaker* concerned the prosecution for passing a worthless check, not theft of services. Moreover, in this case, there is no evidence in the record that the State offered to dismiss the charges against Defendant in exchange for restitution. Further, even after Defendant made payments towards his debt, the State continued to pursue the prosecution for theft of services. These facts indicate that the State's motive for prosecution was not to collect Defendant's debt, but to punish Defendant's fraud. Thus, there is no breach of Article I, Section 18 of the Tennessee Constitution, and Defendant is not entitled to relief.

*II. Subject Matter Jurisdiction*

Defendant essentially argues that the trial court stripped itself of subject matter jurisdiction when it dismissed the worthless check charges. Defendant argues that, as a matter of law, the State could not meet its burden to prove each element of theft of services because the trial court nullified the fraudulent intent element when it dismissed the worthless check charges in counts two through four. Defendant contends that, because the State could not meet its burden as a matter of law, the charges should have been dismissed, the trial court did not have jurisdiction because the indictment failed to charge a lawful accusation, and thus, Defendant's subsequent conviction is a nullity.

In *Dishmon v. Shelby State Community College*, the court of appeals discussed the scope of subject matter jurisdiction:

The concept of subject matter jurisdiction involves a court's power to adjudicate a particular type of controversy. Courts derive their subject matter jurisdiction from the Constitution of Tennessee or from legislative act, and cannot exercise jurisdictional powers that have not been conferred directly on them expressly or by necessary implication.

*Dishmon*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999) (internal citations omitted).

Tennessee Code Annotated section 16-10-102 explicitly provides that "the circuit court has exclusive original jurisdiction of all crimes and misdemeanors, either at common law or by statute[.]" *George T. Haynie, Jr. v. Ricky Bell, Warden*, No. M2006-02752-CCA-R3-CV, 2007 WL 1792534, at *6 (Tenn. Crim. App. June 22, 2007) (citing *State v. Booher*, 978 S.W.2d 953, 597 (Tenn. Crim. App. 1997)), *no perm. app. filed*; Tenn. Code Ann. § 16-10-102 (2018). Here, theft of services is clearly an offense under Tennessee law, and the trial court had subject matter jurisdiction over this offense. *See* Tenn. Code Ann. § 39-14-104 (2014).

Defendant relies on *State v. Trusty* for his contention that the State's failure as a matter of law to establish an essential element of the offense stripped the trial court of subject matter jurisdiction. 919 S.W.2d 305, 309-10 (Tenn. 1996) (stating "[a] lawful accusation is a prerequisite to jurisdiction," and "[a] judgment based on an indictment that does not allege all the essential elements of the offense is a nullity"). Thus, Defendant argues that "the trial court did not have jurisdiction to proceed as there was no crime committed[.]"

Defendant's reliance on *Trusty* is misplaced. The court in *Trusty* was discussing the careful drafting requirements of an indictment "so that it accurately reflects the essential elements of the offense." *Id*. at 310. *Trusty* does not stand for the proposition that a court does not have jurisdiction if the State cannot prove all the elements of the offense, and Defendant cites no authority which supports his contention. Whether the State could prove the elements of the offense is not a question of subject matter jurisdiction but of sufficiency of the evidence. Thus, we will turn to a sufficiency analysis.

### III. Sufficiency of the Evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As pertinent here, a person commits theft of services who "[i]ntentionally obtains services by deception, fraud, coercion, forgery, false statement, false pretense or any other means to avoid payment for the services[.]" Tenn. Code Ann. § 39-14-104(a)(1) (2014). "Fraud . . . includes but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title[.]" Tenn. Code Ann. § 39-11-106(13) (2014). "Obtain" means to "secure the performance of a service[.]" Tenn. Code Ann. § 39-11-106(24)(A)(ii) (2014).

Here, there was sufficient evidence for a rational juror to find that Defendant intentionally obtained services by fraud to avoid payment. As detailed previously, Defendant made and broke thirteen promises to pay and issued four worthless payments. Moreover, the first worthless payment was made via a credit card authorization form prior to Defendant's obtaining the services. Taken in the light most favorable to the State, a rational juror could find that Defendant's repeated unfulfilled promises and delays proved Defendant's fraudulent intent to obtain services and avoid payment. The jury determined the weight to be afforded the evidence, and we will not reweigh it. Defendant is not entitled to relief.

*IV. Indictment*

Defendant argues that the indictment was fatally flawed for failure to charge a crime, for a fatal variance, for the victims' lack of standing, and because the club had been administratively dissolved prior to the November 15, 2014 party. The State responds that the indictment properly charged an offense, that there was no fatal variance, and that the indictment did not need to name a victim.

An indictment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202 (2015).

- 13 -

At common law, indictments were subject to strict pleading requirements because the elements of the offenses were not easily ascertained by reference to a statute. *State v. Hill*, 954 S.W.2d 725, 728 (Tenn. 1997). However, today, courts approach challenges to charging documents "'from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.'" *Id.* (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). Generally, charging documents must allege the material elements of the offense, and the "touchstone for constitutionality is adequate notice to the accused." *Id.* at 729. Specific reference to the statute defining the offense may be sufficient to place a defendant on notice of the offense with which he is charged. *Ruff v. State*, 978 S.W.2d 95, 97 (Tenn. 1998).

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." *Id.* at 299 (citing *Hill*, 954 S.W.2d at 727). The question of the validity of an indictment is one of law, and as such, we review the issue *de novo*. *Hill*, 954 S.W.2d at 727.

## A. Failure to Charge a Crime

Defendant argues that the indictment fails to charge an offense because the issue in the present case is one of a civil debt, not a criminal act. We have previously concluded that Defendant was convicted for his fraud, not for his civil debt, and that there is sufficient evidence to sustain his conviction. Moreover, the indictment for count one stated:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> [DEFENDANT]
>
> on the 15th day of November, 2014, in Davidson County, Tennessee and before the finding of this indictment, intentionally did obtain certain services, to wit: a party, provided by Kevin Woods, dba Club Anthem, of the value of $1,000 or more but less than $10,000, by means of deception, fraud, coercion, false pretense, or other means, with the intent to avoid

payment for the services, in violation of Tennessee Code Annotated § 39-14-104, and against the peace and dignity of the State of Tennessee.

The indictment contained allegations that "(1) enable[d] [Defendant] to know the accusation to which answer is required; (2) furnish[ed] the trial court an adequate basis for entry of a proper judgment; and (3) protect[ed] [Defendant] from a subsequent prosecution for the same offense." *Hammonds,* 30 S.W.3d at 299. First, Defendant knew that he was charged with theft of services involving a party on November 15, 2014. The record shows only one party with Defendant in attendance on November 15, 2014−the one at the club−and Defendant offers no evidence to the contrary. Next, the connection between Mr. Woods and "Club Anthem" was sufficiently clear to establish exactly which entity was the victim in this case. Mr. Woods had only one connection with any club called "Anthem." Thus, there is no threat of prosecution for the same offense because the facts of the indictment, taken together, point to only one possible incident. The indictment clearly indicated that Defendant was charged under Tennessee Code Annotated section 39-14-104 and clearly set out the elements of the offense, giving Defendant proper notice. Defendant is not entitled to relief.

### B. Variance

Defendant argues that Tennessee Code Annotated section 39-14-104(b) creates a requirement to properly identify a victim for an indictment of theft of services to be valid. He contends that "the intersection between the language in [section] 39-14-104(b) and the improper inclusion of 'Kevin Woods dba Club Anthem' created a fatal, material and prejudicial variance in the indictment[.]" The State responds that the essential elements of the offense of theft of services are found entirely in section 39-14-104(a); thus, section 39-14-104(b) merely creates an inclusive, rather than an exclusive, list of who may testify to or complain of the offense as defined in section 39-14-104(a).

A variance between the indictment and the proof submitted at trial is fatal when it is "deemed to be material and prejudicial." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). "A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* (internal citations omitted).

Defendant contends that the theft of services statute differs from the theft of property statute by making "identification of the owner or provider of the allegedly stole[n] services a required, necessary element of the charge." He argues that because the club was not a legal entity since its administrative dissolution and because Mr. Woods

was neither directly nor indirectly harmed, naming "Kevin Woods dba Club Anthem" as the victim in the indictment was a fatal variance. Defendant contends that Tennessee Code Annotated section 39-14-104(b) requires the named victim to be correct, else the indictment fails, because the language of the statute is exclusive.

Defendant arrived at trial fully prepared to defend himself against the charge of theft of services, with the club as the victim. Defendant has presented no evidence that any variance misled him at trial, and we ascertain none in the record. The indictment language in the present case was amply clear in its listing of "Kevin Woods dba Club Anthem" to identify Anthem Nightclub as the victim. Whether listed as "Club Anthem," "Anthem Nightclub," or "Status, LLC," this victim is contemplated by the statute because it was directly harmed by Defendant's theft of services. The indictment provided Defendant with the "overriding purpose of notice to the accused" and thus is constitutionally sufficient. *Hammonds*, 30 S.W.3d at 300. We need not determine whether the language in section 39-14-104(b) is inclusive or exclusive. Defendant is not entitled to relief.

## C. Administrative Dissolution

Defendant claims that the indictment was fatally flawed because Status, LLC, had been administratively dissolved prior to the events in the present case.[4] The indictment in this case contained sufficient information "to meet the constitutional requirements of notice" to Defendant "of the charge against which [Defendant] must defend," to provide an "adequate basis for entry of a proper judgment," and to provided "protection from double jeopardy[.]" *State v. Hill*, 954 S.W.2d 725, 726-27 (Tenn. 1997). The indictment provided sufficient information for Defendant to know whom the victim of the theft of services was. The indictment was not fatally flawed.

## D. Standing

Defendant argues that neither Mr. Woods nor the club had standing to "bring the charge" of theft of services. He contends that Mr. Woods "was not a member, officer or

---

[4] We will not labor long on the corporate law arguments. Administrative dissolution does not terminate the existence of an LLC, but after an LLC is administratively dissolved, it is only permitted to "carry on any business necessary to wind up and liquidate the business." Tenn. Code Ann. § 48-245-302(c),(d). An administratively dissolved LLC can seek reinstatement, and upon reinstatement, the LLC may resume carrying on its business. The reinstatement relates back to the effective date of dissolution "as if the administrative dissolution had never occurred." Tenn. Code Ann. § 48-245-303. Defendant did not introduce proof at trial to support Defendant's claim that the club illegally provided services, that the party provided by the club was not necessary to wind up and liquidate the LLC's business, or that the LLC was never reinstated.

agent" of Status, LLC, and that the club could not "bring the charge" after its administrative dissolution. The State responds that Defendant misconstrues the roles of Mr. Woods and the club because a victim is not a party to a criminal case, so neither Mr. Woods nor the club required "standing" to "bring the charge" of theft of services.

"[A] victim in a criminal case does not meet the definition of a 'party.'" *State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007) (stating that a victim's statement does not meet the hearsay exception for admission of a party opponent because a victim is not a party to a criminal proceeding). Moreover, "[t]he rights of the victim do not include the authority to direct the prosecution of the case." Tenn. Code Ann. § 40-38-114(c) (2015).

Here, Mr. Woods and the club were not parties to the case and did not direct the prosecution of the case. Mr. Woods filed a police report, and the State pursued charges. Because Mr. Woods and the club were not parties to the case, neither required "standing" to "bring charges." Defendant is not entitled to relief.

### V. Evidentiary Issues

Defendant argues that the trial court erred in admitting his bank records showing low or no balances in his bank accounts because they were more prejudicial than probative. He also asserts that the trial court erred by prohibiting evidence of the civil nature of his debt.

The State responds that Defendant waived his evidentiary claims and has not established plain error. The State also contends that the trial court properly admitted the bank records as probative of fraudulent intent and properly excluded Defendant's argument of "civil malfeasance" because the nature of the offense was a matter of law and because any alleged civil malfeasance was irrelevant to any claim or defense.

### A. Standard of Review

Initially, Defendant concedes that he failed to preserve his specific evidentiary arguments below and asks this court to exercise its "discretion to review regarding the review of issues not properly preserved." We note that defense counsel failed to provide a plain error analysis in his brief to this court. While this omission does not automatically fail to satisfy Defendant's burden of persuasion, the practice is strongly discouraged. *See State v. George P. Watkins, III*, No. W2015-02095-CCA-R3-CD, 2017 WL 1294890, at *15 n. 1 (Tenn. Crim. App. Apr. 5, 2017) (stating that "[d]efense counsel, by not providing analysis regarding the five factors for plain error review, nearly failed to satisfy his burden of persuasion. We strongly discourage this practice in this future."), *no perm. app. filed*.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

## B. Bank Records

Defendant asserts that the trial court initially ruled that the worthless checks and related bank records were admissible to show fraudulent intent but that the trial court later contravened its own ruling by allowing the State "to introduce an expanded scope of bank records than were beyond the scope of what would show there was insufficient funds at the time the check was written." He argues that the "checks and bank records were beyond the scope of the single check [of count two] and bank records from the time period relevant to that check [of count two]" were inadmissible. Thus, Defendant contends, the bank records for the checks from counts three and four, which were dismissed prior to trial, were inadmissible.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the

character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*See also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. *State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

Here, Defendant has not established that the trial court breached a "clear and unequivocal rule of law." The trial court conducted a 404(b) analysis[5] and determined that

[t]he [S]tate has to prove intent and knowledge in this case, and . . . I have to determine that the other acts are established by clear and convincing evidence. And I think that just the records themselves show that the two checks written in [c]ounts [three] and [four], which have been dismissed, were clearly there were no funds on account when they were written. So

---

[5] The record indicates that the trial court held a 404(b) hearing regarding Defendant's bank records several days prior to trial. Once the trial court dismissed counts three and four, defense counsel requested the trial court "revisit this and clarify that the bank records . . . now would be irrelevant and excluded" on the morning trial began. The trial court reiterated and clarified its analysis on the record.

that is clear and convincing those acts do exist and they are probative to the issue of knowledge and intent. I will so instruct the jury that they're not to be considered as separate crimes, only as to whether or not he had knowledge and intended to pass a check that had no money in it.

The trial court substantially complied with the requirements of Rule 404(b). The State had to prove fraud as an essential element of the offense. Tenn. Code Ann. § 39-14-104(a)(1) (2014). Fraud can be shown by "deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title[.]" Tenn. Code Ann. § 39-11-106(13) (2014). Defendant's repeated issuing of checks on bank accounts with no or low balances was evidence that his intent was to defraud rather than his inadvertently failing to pay. The trial court did not apply an incorrect legal standard or reach a conclusion that was "illogical or unreasonable and cause[d] an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423 (Tenn. 2018). The trial court did not abuse its discretion in admitting the bank records, so Defendant has not established that the trial court breached a clear and unequivocal rule of law.

## C. Civil Malfeasance

Defendant argues that the trial court erred in excluding his argument that the offense was a civil debt because it deprived him of the right to present a defense. He asserts that

[w]hether [Defendant] truly believed this to be a civil matter from the onset, and whether his actions and those of Club Anthem, including their decision to prosecute criminally instead of civilly, were impacted by the civil malfeasance of Status, LLC[,] were most certainly issues of fact which the jury should have had the opportunity to evaluate.

Defendant claims that the club illegally provided services to Defendant on November 15, 2014, because it had been administratively dissolved prior to the event. Defendant asserts that because the club was only permitted by law to "wind up" its business, Defendant could not "steal" illegally provided services.

Defendant failed to include a transcript for his hearing on the motion for a new trial. The record does not clearly establish what occurred in the trial court regarding his argument of "civil malfeasance." Therefore, Defendant has not established plain error, and he is not entitled to relief.

## Conclusion

Based on the foregoing, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE